UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Jack Davis, | ) |
| | ) |
| Plaintiff, | )   Civil No. 06-01185 (TG)(GK)(HK) |
| | ) |
| v. | )   Three-judge Court |
| | ) |
| Federal Election Commission, | ) |
| | ) |
| Defendant. | ) |

Before: GRIFFITH, Circuit Judge; KESSLER, District Judge; and KENNEDY, District Judge.

**MEMORANDUM OPINION**

GRIFFITH, Circuit Judge:

Plaintiff Jack Davis, the 2006 Democratic Party candidate for New York's 26th District seat in the United States House of Representatives, brings a facial challenge to the so-called "Millionaires' Amendment" of the Bipartisan Campaign Reform Act of 2002 ("BCRA" or the "Act"), 2 U.S.C. § 441a-1 (2002), which relaxes limits on the ability of the opponent of a self-financed House candidate to raise money from donors and to coordinate his campaign spending with party committees.[1]  Davis argues that the Millionaires' Amendment violates the First Amendment by chilling the speech of self-financed candidates and the Equal Protection Clause of the Fifth Amendment by giving the opponents of self-financed candidates a competitive advantage.  Both Davis and the defendant, the Federal Election Commission ("Commission" or

---

[1] The Millionaires' Amendment includes a separate and similar (though not identical) provision for elections to the United States Senate.  *See* 2 U.S.C. § 441a(i).  Davis does not address the BCRA provisions that apply to Senate candidates, nor do we.

"FEC"), have moved for summary judgment. Because we conclude that the Millionaires' Amendment poses no threat to either the First Amendment or the Equal Protection rights of self-financed candidates, we deny Davis's motion for summary judgment and grant the FEC's.

## BACKGROUND

The Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155, 116 Stat. 81 (amending the Federal Election Campaign Act or "FECA," 2 U.S.C. §§ 431 *et seq.* (1971)), represents Congress's most recent attempt to regulate what it has determined to be the potentially corrupting influence of campaign contributions on our political system. *See McConnell v. FEC*, 540 U.S. 93, 115 (2003) ("BCRA is the most recent federal enactment designed to purge national politics of what was conceived to be the pernicious influence of big money campaign contributions." (quotation marks omitted)). The Act includes a provision, commonly referred to as the "Millionaires' Amendment," that addresses what Congress deemed an inequity created when the Supreme Court struck down, on First Amendment grounds, FECA's caps on the amount of personal money a candidate could spend on his campaign, but left in place rigid limits on the amount of campaign contributions he could accept from others.[2] *Buckley v. Valeo*, 424 U.S. 1, 51-54 (1971). The struck provision had limited Presidential and Vice-Presidential candidates to spending $50,000 of their own money on their campaigns, Senate candidates to

---

[2] Its purpose, in the words of one of its sponsors, is to counteract the perception that "someone today who is wealthy enough can buy a seat" in Congress. *See* 147 CONG. REC. S2536-02 (daily ed. Mar. 20, 2001) (statement of Sen. DeWine); *see also* 147 CONG. REC. S2536-02 (daily ed. Mar. 20, 2001) (statement of cosponsor Sen. Durbin) ("[I]n America we won't let you buy an election"). Another sponsor explained that it was intended to "mitigate the countervailing risk that [contribution limits] will unfairly favor those who are willing, and able, to spend a small fortune of their own money to win elections." 148 CONG. REC. S2096-02 (daily ed. Mar. 20, 2002) (statement of Sen. McCain). Its sponsors thought it worked to "increase free speech [by] giv[ing] the non-wealthy candidate the opportunity to get his or her message out," without "punish[ing], . . . inhibit[ing], [or] discourag[ing]" the self-financed candidate "from putting in his or her own money." 147 CONG. REC. S2536-02 (daily ed. Mar. 20, 2001) (Sen. DeWine).

$35,000, and most House candidates[3] to $25,000. *Buckley*, 424 U.S. at 51. The Supreme Court left intact provisions that limited persons (other than candidates helping their own campaigns) to contributing a total of $25,000 to all campaigns in a year and $1,000 to any single campaign. The Millionaires' Amendment relaxes the contribution limits for a candidate who faces a wealthy opponent whose personal fortune put towards his bid for office might give him a significant advantage. It also permits a political party to spend more on behalf of the candidate facing a self-financed opponent.

The Millionaires' Amendment mandates that once a self-financed candidate spends more than $350,000 of his personal funds on a campaign, his opponent may be permitted (1) to receive contributions at three times the limit for each donor that would otherwise be in place,[4] 2 U.S.C. § 441a-1(a)(1)(A); (2) to receive contributions from individuals who have reached what would otherwise be their statutory limit for aggregate campaign donations,[5] *id.* § 441a-1(a)(1)(B); and (3) to coordinate with their political party on additional party expenditures that would otherwise be limited,[6] *id.* § 441a-1(a)(1)(C). To take advantage of those benefits, the opponent of a self-financed candidate must first calculate the "opposition personal funds amount" ("OPFA") to

---

[3] A candidate for a House seat in a state with only one Representative was permitted the $35,000 limit.

[4] Contribution limits are adjusted every election cycle to account for changes in the consumer price index. For the current election cycle, donors may not contribute more than $2,300 to a candidate per election. Press Release, Federal Election Commission, FEC Announces Updated Contribution Limits (Jan. 23, 2007), http://www.fec.gov/press/press2007/20070123limits.html.

[5] During an election cycle—beginning January 1 of an odd-numbered year and ending on December 31 of the next even-numbered year—no individual may make contributions totaling more than $37,500 to candidates and their authorized committees. Once the Millionaires' Amendment has been triggered, however, individuals who had previously reached the statutory limit on their total contributions may contribute more money to the self-financed candidate's opponent subject to the limitations of 2 U.S.C. § 441a-1(a)(1)(A) (which allows for contributions up to three times the normal limit).

[6] 2 U.S.C. § 441a(d) limits the amount of money the national and state committees of a political party may spend in coordination with the general election campaign of a candidate for federal office. Although these "coordinated expenditures" may be limited, *see FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 465 (2001), "independent expenditures" (*i.e.*, expenditures made by a party committee that are not coordinated with the candidate's campaign) made by these same committees may not, *see Colo. Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604, 618 (1996). The Millionaires' Amendment removes FECA's limits on coordinated expenditures.

determine whether he is eligible for relaxed limits on fundraising. *Id.* § 441a-1(a)(1). To calculate the OPFA, the opponent determines the amount of personal funds spent by each candidate (*i.e.*, the self-financed candidate and himself), adds 50% of the total funds raised by each candidate during the year prior to the election, and compares the totals. *Id.* § 441a-1(a)(2). If the opponent's OPFA is above that of the self-financed candidate, he may not take advantage of the relaxed limits and coordinated expenditures. If it is not, then he may take advantage of the relaxed limits, but only until parity is achieved under the OPFA formula. Once each candidate's OPFAs are equal, the Millionaires' Amendment no longer applies, and the opponent of the self-financed candidate cannot take advantage of the relaxed limits on contributions and coordinated expenditures. *Id.* § 441a-1(a)(3)(ii).

The Amendment also changes the reporting requirements for self-financed candidates and their opponents. Each candidate must, within fifteen days of announcing his candidacy, file a Statement of Candidacy with the FEC declaring the amount of personal funds over $350,000 that he intends to spend, if any. *Id.* § 441a-1(b)(1)(B). A candidate who makes or obligates to make expenditures of more than $350,000 in personal funds on his campaign must notify the FEC within twenty-four hours of doing so. *Id.* § 441a-1(b)(1)(C). Once that threshold is crossed, the self-financed candidate must notify the FEC within twenty-four hours of each additional aggregate expenditure of personal funds of $10,000. *Id.* § 441a-1(b)(1)(D). The opponent of a self-financed candidate who takes advantage of the relaxed contribution limits and coordinated party expenditures must notify the FEC and his party within twenty-four hours of receiving contributions and party expenditures that equal 100% of the OPFA. 11 C.F.R. § 400.31(e)(1)(ii). Political parties are also required to notify the candidate and the FEC within twenty-four hours of making any coordinated party expenditures. *Id.* § 400.30(c)(2).

\*   \*   \*

Jack Davis ran and lost a self-financed campaign as the Democratic nominee for a congressional seat in the 2004 general election. He ran again for the same seat in the 2006 general election. As required by BCRA, on March 23, 2006, he filed his Statement of Candidacy, and declared that he intended to spend no personal funds during the primary campaign for the Democratic Party nomination and $1,000,000 in personal funds during the November general election. On June 6, 2006, Davis filed a facial challenge to the Millionaires' Amendment in this Court. He moved for summary judgment, as did the FEC, and on October 20, 2006, sitting as a three-judge district court, we heard oral argument on both motions. We have jurisdiction over this matter pursuant to 28 U.S.C. § 1331 ("district courts shall have original jurisdiction of all civil actions arising under the Constitution"). Venue is proper pursuant to § 403 of BCRA ("[t]he action shall be filed in the United States District Court for the District of Columbia and shall be heard by a 3-judge court") and 28 U.S.C. § 2284 ("a district court of three judges shall be convened when otherwise required by Act of Congress").

**DISCUSSION**

Although the FEC does not challenge Davis's standing to bring this claim, our independent duty to confirm our authority over each case before us requires that we certify standing "even when not otherwise suggested." *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (citation omitted). The "irreducible constitutional minimum of standing" consists of three elements: (1) an "injury in fact" that is (2) "fairly . . . trace[able] to the challenged action of the defendant," and (3) "likely . . . redress[able] by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (first alteration in original, internal

quotations marks and citations omitted).  The Millionaires' Amendment imposes new and added disclosure requirements on self-financed candidates such as Davis, including a declaration of intent to spend more than $350,000 of the candidate's own funds that must be filed within fifteen days of becoming a candidate; an initial notification that the candidate has spent more than $350,000 of his own funds; and additional notifications throughout the campaign for aggregate expenditures in excess of $10,000.  2 U.S.C. § 441a-1(b).  These additional disclosure requirements impose an injury-in-fact on self-financed candidates that can be traced directly to the Millionaires' Amendment and that would be removed by a favorable decision from this court.  *Cf. Larson v. Valente*, 456 U.S. 228, 241 (1982) (concluding that state's attempt to enforce reporting requirements under Minnesota charitable solicitation statute constituted sufficient injury for standing).  Davis therefore has standing to challenge the Amendment, and we may turn to the merits of his argument.

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also* FED. R. CIV. P. 56.  Davis mounts a facial challenge to the constitutionality of the Millionaires' Amendment based upon the First and Fifth Amendments, asking us to "go beyond the facts before [us] to consider whether . . . the legislation creates such a risk of curtailing protected conduct as to be constitutionally unacceptable on its face." *Sanjour v. EPA*, 56 F.3d 85, 92 n.10 (D.C. Cir. 1995) (citation omitted).  As the Supreme Court has observed, a facial challenge to legislation is, in general, "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).  As-applied challenges, by contrast, seek to "declare the challenged statute or

regulation unconstitutional on the facts of the particular case." *Sanjour*, 56 F.3d at 92 n.10. Because of the potentially broad remedial sweep a facial challenge seeks—invalidating the entire statute—it is "manifestly, strong medicine that has been employed by the Court sparingly and only as a last resort," *Nat'l Endowment for the Arts v. Finely*, 524 U.S. 569, 580 (1998) (internal quotation marks omitted).

Davis's facial challenge has two prongs—the First Amendment's protection for freedom of speech and the Fifth Amendment's requirement of equal protection. We examine the two challenges under different modes of analysis. When examining facial challenges, there are "two quite different ways in which a statute or ordinance may be . . . invalid 'on its face'—either because it is unconstitutional in every conceivable application, or because it seeks to prohibit such a broad range of protected conduct that it is unconstitutionally 'overbroad.'" *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 417 F.3d 1299, 1312 (D.C. Cir. 2005) (quotation marks and citation omitted). "Although the 'every application' formulation is the general rule, the latter is the rule for facial challenges brought under the First Amendment." *Id.* Because Davis is challenging the Millionaires' Amendment on First Amendment grounds, he need not demonstrate that there are no circumstances under which the amendment would be constitutionally valid, but must show that it "punishes a substantial amount of protected free speech." *Virginia v. Hicks*, 539 U.S. 113, 118 (2003) (quotation marks omitted). For other challenges to prevail, including Davis's Fifth Amendment claim, "the challenger must establish that no set of circumstances exists under which the Act would be valid." *Salerno*, 481 U.S. at 745.

To determine whether the Millionaires' Amendment "punishes a substantial amount of free speech" and thus unconstitutionally infringes a candidate's First Amendment rights, we

must first determine whether it actually "burdens the exercise of political speech and, if it does, whether it is narrowly tailored to serve a compelling state interest." *Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 657 (1990). The Supreme Court has warned that "[a] restriction on the amount of money a person or group can spend on political communication during a campaign" may create such a burden "because virtually every means of communicating ideas in today's mass society requires the expenditure of money." *Buckley*, 424 U.S. at 19.

And so we approach Davis's claim mindful that when Congress legislates to regulate the raising and spending of funds to finance a campaign for elective office, we have a special duty to safeguard core First Amendment values.[7] But Davis's First Amendment facial challenge fails at the outset because the Millionaires' Amendment does not "burden[] the exercise of political speech." It places no restrictions on a candidate's ability to spend unlimited amounts of his personal wealth to communicate his message to voters, nor does it reduce the amount of money he is able to raise from contributors. Rather, the Millionaires' Amendment accomplishes its sponsors' aim to preserve core First Amendment values by protecting the candidate's ability to enhance his participation in the political marketplace. *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969) ("It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail . . . .").

The Millionaires' Amendment does not limit in any way the use of a candidate's personal wealth in his run for office. Instead, it provides a benefit to his opponent, thereby correcting a potential imbalance in resources available to each candidate. In this respect, it is similar to

---

[7] "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order 'to assure (the) unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Buckley*, 424 U.S. at 14 (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)) (alteration in original); *see also Eu v. S.F. County Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989) ("[T]he First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office.") (quotation marks omitted).

statutes that permit higher contribution limits for candidates who agree to public financing of their campaigns.  This means of regulating the way candidates raise and spend money to pursue elective office has been consistently upheld against First Amendment challenges.  *See Daggett v. Comm'n on Gov't Ethics & Election Practices*, 205 F.3d 445, 464-65 (1st Cir. 2000) (upholding statute that provided public matching funds to candidate participating in public financing scheme when independent expenditures were made against him or on behalf of his non-participating opponent); *Gable v. Patton*, 142 F.3d 940, 948 (6th Cir. 1998) (where the statute provided 2-1 public matching funds for candidates who agreed to limit campaign expenditures, upholding a provision that waived the expenditure limit when a non-participating opponent raised funds in excess of that amount); *Rosenstiel v. Rodriguez*, 101 F.3d 1544, 1551 (8th Cir. 1996) (where the statute provided public financing to candidates who agreed to limit overall expenditures, upholding a "waiver" provision that raised the agreed-to expenditure limitation when a privately financed opponent spent in excess of the limit); *Vote Choice, Inc. v. DiStefano*, 4 F.3d 26, 39 (1st Cir. 1993) (upholding statute that permitted candidates who agreed to accept public funding and limit their expenditures to accept $2,000 contributions, while limiting non-participating opponents to accepting $1,000).

Davis nonetheless argues that the Millionaires' Amendment burdens the free speech rights of wealthy candidates because it discourages them from self-financing their campaigns, which the Supreme Court has held is a form of protected First Amendment speech.  *See Buckley*, 424 U.S. at 51-54.  According to Davis, candidates who are considering self-financing will be reluctant to do so—a chill on their political speech—because the Millionaires' Amendment will (1) give their electoral opponents a competitive advantage, (2) allow even more "corrupt special

interest money" into the system, and (3) burden self-financing candidates with additional reporting provisions and prescribed calculations. We consider each of these arguments in turn.

Davis builds his argument of competitive advantage on a common sense observation about the hardball nature of electoral politics in dicta in a case from the First Circuit: "[B]ecause a head-to-head election has a single victor, *any* benefit conferred on one candidate is the effective equivalent of a penalty imposed on all other aspirants for the same office." *Vote Choice*, 4 F.3d at 38 (emphasis in original). But recognizing that electoral politics may be a zero-sum game in which a benefit conferred on one candidate is a disadvantage to his opponent fails to address the only issue that might raise constitutional concerns: whether the benefit conferred chills political speech. To prove a First Amendment violation, Davis must demonstrate that a self-financed candidate's speech would be impermissibly chilled, not simply that his opponent would gain some benefit. In fact, the *Vote Choice* case undercuts Davis's argument. The First Circuit rejected a challenge to Rhode Island's public financing statute based on a claim, much like Davis's, that it impermissibly raised the donor limit for candidates who accepted public funds. The First Circuit determined that the statute, which, like the Millionaires' Amendment, provided the benefit of increased contribution limits to the challenging candidate's opponent, was constitutional because it merely "facilitate[d] communication by candidates with the electorate" and "a [non-participating] candidate suffer[ed] no more than a countervailing denial" of the benefit. *Id.* at 39 (quotation marks omitted).

Davis is correct to suggest that there may be cases in which a regulatory scheme creates a competitive advantage so extreme that it works an unconstitutional burden on a candidate's First Amendment right to pursue elective office. But no court has found such an unconstitutional burden where the disadvantage is the result of the candidate's choice to fund his campaign from

one of several permissible funding sources. In *Buckley*, the Supreme Court upheld expenditure limitations for candidates who chose to participate in public financing of their campaigns. 424 U.S. at 57 n.65. The Court concluded that because the candidate's participation was voluntary, the otherwise impermissible burden on his speech rights passed constitutional muster:

> Congress may engage in public financing of election campaigns and may condition acceptance of public funds on an agreement by the candidate to abide by specified expenditure limitations. Just as a candidate may voluntarily limit the size of the contributions he chooses to accept, he may decide to forgo private fundraising and accept public funding.

*Id.*; *see also Vote Choice*, 4 F.3d at 38 ("[V]oluntariness has proven to be an important factor in judicial ratification of government-sponsored campaign financing schemes."); *Rosenstiel*, 101 F.3d at 1550 ("Because participation is truly voluntary . . . the Appellants' argument that their First Amendment rights are burdened is without merit."); *Republican Nat'l Comm. v. FEC*, 487 F.Supp. 280, 283-86 (S.D.N.Y.) (1980) (three-judge court), *aff'd mem.*, 445 U.S. 955 (1980) (holding that the public funding scheme did not burden a candidate's First Amendment rights because it simply provided an additional option for accumulating funds).

It is conceivable that the disadvantage imposed by the statute may be so onerous that the candidate, in effect, has no choice. In such cases, the disadvantage may well create an unconstitutional burden. *See Gable*, 142 F.3d at 948 ("[A]lthough a statutorily created benefit does not per se result in an unconstitutional burden, such benefits could conceivably snowball into a coercive measure upon a non-participating candidate.") (quotation marks omitted); *Vote Choice*, 4 F.3d at 38 ("[T]here is a point at which regulatory incentives stray beyond the pale, creating disparities so profound that they become impermissibly coercive."); *Rosenstiel*, 101 F.3d at 1550 ("[T]he State's public financing package does not . . . create such a large disparity between benefits and restrictions that candidates are coerced to publicly finance their

campaigns."). But there is no issue of compulsion here. The Millionaires' Amendment does not create disparities, but rather seeks to reduce them by "leveling the playing-field" between candidates who are able to spend large amounts of personal wealth on their campaigns and those who cannot. Davis presents no evidence that, or credible explanation why, the Amendment coerces wealthy candidates into foregoing self-financing. Davis has offered no evidence that self-financed candidates are not running for office or choosing not to self-finance or self-financing less because of the Millionaires' Amendment.

Perhaps most significantly of all, he has failed to show that his speech has been limited in any way because of the benefits the Amendment provides his opponent. In fact, Davis himself has *twice* elected to self-finance. We thus conclude that the Millionaires' Amendment does not "stray beyond the pale, . . . becoming impermissibly coercive." *Vote Choice*, 4 F.3d at 38. As Davis himself has shown, whether a candidate incurs the burdens and benefits of the Amendment is entirely his option, and a statute whose application turns on such a choice does not impose an unconstitutional burden on First Amendment rights. *See id.* at 39 ("[W]e have difficulty believing that a statutory framework which merely presents candidates with a voluntary alternative to an otherwise applicable, assuredly constitutional, financing option imposes any burden on [F]irst [A]mendment rights."); *Republican Nat'l Comm.*, 487 F. Supp. at 285 ("[A]s long as the candidate remains free to engage in unlimited private funding and spending . . . the law does not violate the First Amendment rights of the candidate or supporters.").

Davis further claims that he is concerned about the corrupting influence on the electoral process of "special interest money," although he never defines this pejorative term.[8] Plaintiff's

---

[8] It is not clear to us what Davis means by his reference to "corrupt special interest money," especially in light of his filings with the FEC that report that he accepts contributions to fund his campaign and does not rely entirely on his own money. *See* Jack Davis, Report of Receipts and Disbursements, FEC Form 3, 11 (filed Apr. 14, 2005). Davis

Mem. of Points and Authorities at 24. The Millionaires' Amendment, he argues, has a chilling effect on his speech because it enables "his opponent to partake in a deluge of the same corrupting money that fostered [his] self-financed candidacy in the first instance." *Id.* In other words, a candidate who chooses to self-finance because he abhors the "corrupting influence of special interest money" in the campaign finance system will be reluctant to spend more than $350,000 of his own money because doing so will, from his perspective, further corrupt the system. However, Davis never explains how the fact that his opponent's campaign is funded by "corrupting money" has a chilling effect on <u>his</u> mostly self-financed campaign. In fact, the day Davis filed his Statement of Candidacy with the FEC, he indicated that he planned to spend $1,000,000 of his own money on his campaign. We struggle to see how Davis can credibly argue that his speech has been "chilled" in light of the fact that he has chosen to pay for his campaign and has spent, after all, a considerable amount of his own money in excess of the $350,000 cap. Many a candidate would welcome the opportunity to be similarly "chilled."

We are also not persuaded by Davis's claim that the new and added disclosure requirements on self-financed candidates created by the Millionaires' Amendment burden his First Amendment right to participate freely in political activities. *See* Davis Compl., ¶ 24 (June 28, 2006). The Supreme Court has consistently upheld against First Amendment challenges statutes that impose the burden of reporting campaign finance fundraising and expenditures no less onerous than those that trouble Davis.

In *Buckley*, the Court reviewed the constitutionality of FECA's reporting provisions, which replaced all prior disclosure laws and imposed an entirely new disclosure regime on

---

never explains why the contributions he accepts are not "corrupting special interest money." It is safe to say that one candidate's "corrupting special interest money" may be another candidate's "contributions from devoted supporters who believe in her legislative policies."

candidates and "political committees."[9]  424 U.S. at 62.  FECA required candidates and political committees to keep detailed contribution and expenditure records including "the name and address of everyone making a contribution in excess of $10, along with the date and amount of the contribution. If a person's contributions aggregate more than $100, his occupation and principal place of business are also to be included."  *Id.* at 63.  Additionally, each candidate and political committee was to file quarterly reports that contained "detailed financial information" on its contributions and contributors.  The Court found "no constitutional infirmities in the recordkeeping reporting, and disclosure requirements of [FECA]."  *Id.* at 84.

In *McConnell*, the Court examined the constitutionality of a provision in BCRA that required a disclosure statement to be filed with the FEC "whenever any person makes disbursements totaling more than $10,000 during any calendar year for the direct costs of producing and airing electioneering communications," 540 U.S. at 194, and "[t]he statement must be filed within twenty-four hours of each 'disclosure date'—a term defined to include the first date and all subsequent dates on which a person's aggregate undisclosed expenses for electioneering communications exceed $10,000 for that calendar year," *id.* at 195.  The Court upheld these BCRA reporting provisions, as bothersome as they are, concluding that they were constitutional because they "d[o] not prevent anyone from speaking."  *Id.* at 201 (quoting *McConnell v. FEC*, 251 F. Supp. 2d 176, 241 (D.D.C. 2003)) (quotation marks omitted).  The challenged reporting provisions of the Millionaires' Amendment do not either.

Because Davis concedes that all of the information required by the reporting provisions would eventually have to be disclosed to the FEC whether or not the Millionaires' Amendment ever applies, his argument that the reporting provisions "impose a significant burden on self-

---

[9] FECA defined a "political committee" as "a group of persons that receives contributions or makes expenditures of over $1,000 in a calendar year."  *Buckley*, 424 U.S. at 62 (quotation marks omitted).

financed candidates and thus, violate the First Amendment," Plaintiff's Mem. of Points and Authorities at 16, is essentially a complaint about the timing elements of the reporting requirements—specifically the twenty-four-hour deadline for reporting aggregate spending of $10,000. But the timing deadlines of the Millionaires' Amendment are no more burdensome than other BCRA reporting deadlines that were upheld in *McConnell*. The twenty-four-hour deadline for reporting each $10,000 expenditure in excess of $350,000 mirrors the deadline for reporting each $10,000 expenditure on electioneering communications upheld by the *McConnell* Court. 540 U.S. at 194-95.

Davis also complains that the reporting provisions are unconstitutional because they create "a unilateral burden." This argument fares no better than the others. First and foremost, as illustrated above, the reporting provisions do not in fact burden First Amendment speech rights. Moreover, any burden that the reporting provisions may hypothetically impose is not "unilateral." The opponent of a self-financed candidate also faces additional reporting requirements, which are similar to those of the self-financed candidate's. After receiving the self-financed candidate's initial or subsequent notice of expenditures from personal funds, the opposing candidate must, within twenty-four hours, notify the FEC and his political party of the OPFA. 11 C.F.R. § 400.30(b). If the opposing candidate receives increased contributions and increased coordinated party expenditures equal to 100% of the OPFA, the opposing candidate must notify the FEC and his political party within twenty-four hours. *Id.* § 400.31(e)(1)(ii). He must also report when the contributions are Millionaires' Amendment contributions, when he reaches the proportionality cap, and if he ever refunds Millionaires' Amendment contributions. *Id.* Additionally, political parties that make coordinated party expenditures under the

Millionaires' Amendment must notify the FEC, as well as the candidate on whose behalf the expenditure was made, within twenty-four hours. *Id.* § 400.30(c)(2).

Finally, we reject Davis's claim that the "substantial and unjustified competitive injury inflicted on self-financed candidates" violates the Equal Protection Clause of the Fifth Amendment. Plaintiff's Mem. of Points and Authorities at 26. The touchstone of an Equal Protection argument is that the challenged statute is flawed because it treats similarly situated entities differently. *See Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 200 (1981) (plurality opinion); *see also Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 736 (D.C. Cir. 2007) (noting that in order "to survive summary judgment [plaintiff] must show that it was treated differently" than a party who is similarly situated).

Davis cannot make this showing because the reasonable premise of the Millionaires' Amendment is that self-financed candidates are situated differently from those who lack the resources to fund their own campaigns and that this difference creates adverse consequences dangerous to the perception of electoral fairness. Davis, in fact, is situated quite differently from his opponent because he has chosen to finance his campaign with personal wealth, which is subject to no limits, while his opponent has chosen to finance his campaign with contributions that are subject to statutory limits. A candidate like Davis who chooses to self-finance his campaign may have access to funds that are unavailable to an opponent who cannot pay for his campaign personally or chooses not to. In Congress's view, it was this fundamental difference between candidates that posed the problem it sought to address through the Millionaires' Amendment. The Millionaires' Amendment is an attempt to provide at least a partial remedy for what Congress decided was an unavoidable problem when political opponents for elected office

are not similarly situated in their abilities to fund a campaign from their own resources. By trying to reduce such a disparity, Congress does not run afoul of the Equal Protection Clause:

> [T]he Constitution does not require Congress to treat all declared candidates the same for public financing purposes. As we said in *Jenness v. Fortson*, "there are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other . . . . Sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike . . . ."

*Buckley*, 424 U.S. at 97-98 (quoting *Jenness v. Fortson*, 403 U.S. 431, 441-442 (1971)) (first ellipsis in original); *see, e.g.*, *Schweiker v. Hogan*, 457 U.S. 569, 590 (1982) (declining to find an equal protection violation in a state Medicaid program which provides more generous benefits to poor people because "in terms of their ability to provide for essential medical services, the wealthy and the poor are not similarly situated and need not be treated the same"). We find no Fifth Amendment violation in Davis's claim.

## CONCLUSION

For the reasons set forth above, we grant FEC's motion for summary judgment and deny Davis's motion for summary judgment.

This the 9th day of August, 2007.

_____
United States Circuit Judge

_____
United States District Judge

_____

United States District Judge